UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KIM E.,[1]

                           Plaintiff                      DECISION and ORDER

-vs-

                                                              1:20-CV-01784 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                           Defendant.

_____

### INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits. Now before the Court is Plaintiff's motion (ECF No. 14) for judgment on the pleadings and Defendant's cross-motion (ECF No. 16) for the same relief. For the reasons discussed below, Plaintiff's application is granted and Defendant's application is denied.

### STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

> such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim. In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West). Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402,

---

[2] Residual functional capacity or RFC "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). However, not every legal error by an ALJ requires reversal. Rather, an error may be deemed harmless unless it prejudices the plaintiff by negatively affecting the outcome of the ALJ's decision. *See, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).[3]

If the Commissioner applied the correct legal standards, or if any legal error was harmless, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude

---

[3] *See also, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) ("[W]e agree that any such error was harmless, since Monroe has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("[A]ssuming that the Appeals Council erred, there was nevertheless no reasonable possibility that consideration of Dr. Liotta's report would have altered the ALJ's decision, because the evidence that Dr. Liotta adduced was not materially different from that which was already before the ALJ and the vocational expert when they reached their conclusions."); *but compare, Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Dr. Wheeler provided the ALJ with an opinion that Greek . . . would likely be absent from work more than four days per month as a result of his impairments or treatment. . . . Because a vocational expert in this case testified that Greek could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless.").

otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying the substantial-evidence standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary for purposes of this Decision and Order.

On July 19, 2018, Plaintiff filed an application for SSDI benefits, claiming that she became disabled on January 2, 2018, due to "back injury, migraines, insomnia, depression and anxiety. Tr. 326. Prior to that Plaintiff had worked at Home Depot for twenty years as a receiving clerk. Tr. 327. On or about November 3, 2015, Plaintiff injured her shoulder and neck while lifting packages at work.

Plaintiff pursued a worker's compensation claim which remained pending at the time of the Administrative Law Judge's ("ALJ") decision in this action. In connection with the worker's compensation claim, doctors have at times expressed opinions concerning Plaintiff's percentage of impairment or disability. *See, e.g.*, Tr. 562 (Indicating that Plaintiff had 60% "temporary impairment."); *see also*, Tr. 589 ("Ms. E[ ] is presently disabled (marked, partial). Were a sedentary position available that would allow her to change positions as often as necessary, it is possible she might be able to return to work.").

Plaintiff, who continued working at Home Depot for more than two years after the neck/shoulder injury, experienced progressively worsening pain, as well as tingling and numbness radiating into both arms. Tr. 467, 558. Diagnostic testing subsequently revealed degenerative disc disease in the cervical spine, and on January 19, 2018, Plaintiff had cervical spine fusion surgery after a long list of more-conservative treatments failed. Tr. 472, 502-503, 563 (Noting, pre-operatively, that, "she has failed conservative management and remains with significant radicular findings."), 810, 818, 911. However, surgery did not bring Plaintiff relief, and she continued to complain of pain, difficulty sleeping and muscle weakness, along with mild anxiety and depression secondary to her pain. Tr. 572, 578, 753, 952. Plaintiff also began to experience headaches and migraine-type headaches. Tr. 1132.

On June 12, 2018, neurologist Richard Kanoff, D.O. ("Kanoff"), performed an independent neurosurgical examination and made notations which, in pertinent part, seem to accurately summarize Plaintiff's course of treatment up to that point and subjective complaints:

> [Following her injury at work on November 3, 2015, Kim] developed neck pain that was constant and ranging in intensity from 3/10 at its least, to 10/10 at its worst. . . . [MRI imaging] revealed discogenic changes at multiple levels, including C5-6

5

> and a small disc herniation on the symptomatic right side at C6-7. . . . [O]n January 19, 2018, she underwent C5-6 cervical discectomy and instrumental fusion. At the time of surgery, her neck pain was constant, as was her arm pain. . . . At the present time, she states her neck pain is actually worse than before the surgery, as are her left upper extremity symptoms. . . . In addition to worsening neck and arm pain, [Kim] complains of 'migraines' since the surgery. What she describes is an occipitocervical origin that extends 'everywhere.' She states they will occur two to three times weekly and last all day. In addition, she states that her preoperative difficulty sleeping has persisted since the surgery. At the present time her sitting tolerance is two to four hours, while her standing tolerance is less than two hours. She tries to walk one mile every day despite the discomfort. [She] has been cleared to operate a motor vehicle[.] . . . Prior to being injured, [she] indicated that she was independent with all household activities and remained so until her surgery, since which time she has been limited. Prior to the incident and up to the time of surgery, her recreational pursuits including biking, roller-blading, aerobics, and going to the gym to lift weights. She has been able to do none of these things since the surgery.

Tr. 1132.

Because the surgery did not alleviate Plaintiff's pain, her treatment providers tried various treatments, including opioid medications, epidural injections, chiropractic and physical therapy, but these also were not effective in relieving her neck and arm symptoms. Tr. 975, 978.[4] After trying a wide variety of medications without success, a pain management specialist approved Plaintiff for medical marijuana treatment, about which Plaintiff has reported inconsistent results. *Compare*, Tr. 1245; 1493 ("It really helps.") & 1532 ("She has also tried medical marijuana, unfortunately without any benefit.").

The exact cause of Plaintiff's continued neck and arm pain is unclear to her doctors, as radiological studies indicate that the cervical fusion hardware was properly installed, and

---

[4] Plaintiff also previously had carpal tunnel release surgery on her right wrist, Tr. 840, 861, and later testing revealed mild left-side carpal tunnel syndrome. Tr. 1378.

electrodiagnostic testing performed on November 1, 2018, was negative for any neurological abnormality except mild left carpal tunnel syndrome. Tr. 1439; 1458 ("I remain at a loss to explain structurally her issues related to her cervical radicular changes.  MRI demonstrates well decompressed central canal.   There is no evidence of residual central or foraminal stenosis."); 1460 (Hardware properly installed; Plaintiff may want to explore use of cervical spinal cord stimulator).  Nevertheless, treatment providers have indicated that Plaintiff's complaints are "consistent with myofascial pain" and "radicular pain consistent with the degeneration throughout her cervical spine." Tr. 1467.  On July 25, 2019, pain management specialist Jafar Siddiqui, M.D. ("Siddiqui") diagnosed Plaintiff with "radiculopathy, cervical region," "chronic pain syndrome" and "postlaminectomy syndrome, not elsewhere classified." Tr. 1528.  On September 13, 2019, orthopedic surgeon Daniel Carr, M.D. ("Carr") consultatively described Plaintiff's condition as "chronic cervical degenerative spondylosis." Tr. 1473.

Post-surgery physical examinations generally indicated that Plaintiff had limited range of motion in the cervical spine along with pain from movement and tenderness to palpation, but normal gait and strength. *See, e.g.*, Tr. 1533 (9/10/19: "The patient is able to rise from a seated to standing position without difficulty.  She has normal gait and station.  She has limited range of motion of the cervical spine in all planes for forward flexion, extension, lateral rotation and side bending bilaterally.  Range of motion testing increases her pain.  She has tenderness to palpation in the bilateral upper trapezius and cervical paraspinal muscles.  She has well preserved strength throughout all myotomes[5] of the bilateral upper extremities.  She has

---

[5] Myotome refers to "a group of muscles innervated from a single spinal nerve." https://medical-dictionary.thefreedictionary.com/myotomes

7

negative Hoffmann signs[6] bilaterally.  She has normal muscle tone throughout without any spasticity or rigidity."); *see also*, Tr. 1636 (similar findings).

Prior to the administrative hearing, treating and consulting medical providers expressed opinions regarding Plaintiff's ability to work.  For example, examining consultant Dulan Hailoo, M.D. ("Hailoo") found that Plaintiff had moderate limitations in prolonged standing and walking (but not sitting), and moderate limitation in heavy lifting and carrying, pushing, pulling and reaching, and fine manipulation with the left hand. Tr. 1215.  Agency review physician J. Koenig, M.D. ("Koenig") indicated that Plaintiff could occasionally lift and carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and with limitations in reaching bilaterally and handling with the left hand. Tr. 142–143.  Treating physician Dr. Carr, meanwhile, opined that Plaintiff could lift 40 pounds occasionally, 20 pounds frequently, and perform "no repetitive overhead lifting against resistance." Tr. 1474.

On January 21, 2020, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with her attorney.  The ALJ took testimony from Plaintiff and a vocational expert ("VE").  Plaintiff claimed to be disabled due to a combination of cervical radiculopathy post-fusion of the cervical spine, chronic pain syndrome, headaches, arm weakness, bilateral arm numbness, anxiety and depression. Tr. 99.  At that time Plaintiff was 52 years of age and had completed high school. Tr. 326.

---

[6] "Hoffman's sign or reflex is a test that doctors use to examine the reflexes of the upper extremities. This test is a quick, equipment-free way to test for the possible existence of spinal cord compression from a lesion on the spinal cord or another underlying nerve condition." https://www.medicalnewstoday.com/articles/322106   A positive Hoffman test suggests cervical cord compression.

On February 5, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged onset date, January 2, 2018, and the date of the decision. In pertinent part, the ALJ found, at Step Four of the five-step sequential evaluation, that Plaintiff had the RFC to perform less-than-a-full-range of light work. Tr. 60.[7] Then, at Step Five, the ALJ found that Plaintiff could perform certain jobs existing in sufficient numbers in the national economy, and therefore was not disabled. Tr. 66-67. In making his RFC determination, the ALJ discussed the various medical evidence, including the opinions rendered in connection with Plaintiff's workers compensation claim. The ALJ concluded such discussion by stating:

> Finally, I did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c), such as the various disability percentages and ratings assigned to the claimant, the statements that the claimant cannot perform full-time work, and the various off-work excuses for the claimant (*see, e.g.*, 25F/9,[8] 36F/113,[9] 115,[10] 40F/62,[11] 42F,[12] 45F,[13] 46F[14]).

Tr. 66.

Plaintiff appealed the ALJ's determination to the Appeals Council, and in support thereof, submitted additional medical evidence, most of which was written within a few months after the

---

[7] "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position." Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983)
[8] Tr. 1147 (100% temporary impairment).
[9] Tr. 1363 (100% temporary impairment).
[10] Tr. 1365 (doctor's note excusing Plaintiff from work).
[11] Tr. 1461(100% temporary impairment)
[12] Tr. 1473 ("She is capable of work but not full-duty work. She has a moderate (50%) partial disability.").
[13] Tr. 1513 (100% temporary disability).
[14] Tr. 1541 (100% temporary disability).

9

ALJ's decision. Tr. 2. Specifically, on February 13, 2020, Plaintiff's long-time treating pain management physician's assistant Julia Gajewski, PA ("Gajewski"), completed an RFC statement. Tr. 32–35. Gajewski indicated in pertinent part that Plaintiff could sit, stand and/or walk less than two hours total in an 8-hour workday, only occasionally lift ten pounds, not use her left hand at all, and only use her right hand 25% of the time. Gajewski also stated that Plaintiff would be off task more than 25% of the workday; that she was incapable of even loss stress work; that she would have good days and bad days; and that she would miss work more than four days per month due to her symptoms. Tr. 35. On February 20, 2020, Plaintiff's treating pain management specialist, Tahir Qazi, M.D. ("Qazi"), performed a physical examination and reported tenderness and limited range of motion in cervical spine, altered sensation in hands, decreased grip strength. Tr. 29. Qazi indicated in pertinent part that Plaintiff could only occasionally lift and carry ten pounds, grasp, reach, or manipulate. Tr. 24. And, on June 23, 2020, and August 18, 2020, respectively, physical medicine and rehabilitation specialist Andrew Matteliano, M.D. ("Matteliano") examined Plaintiff and reported sensory loss in the right arm, loss of grip strength bilaterally, restricted range of motion in cervical spine and cervical tenderness. Tr. 43. Matteliano indicated that Plaintiff had "disc herniations now above and below her fusion." Tr. 49. Matteliano estimated that Plaintiff would be limited to sedentary work and recommended that she pursue vocational rehabilitation. Tr. 49.

However, the Appeals Council denied the request for review, and declined to consider any of the aforementioned additional evidence, stating in pertinent part:

> The Administrative Law Judge decided your case through February 5, 2020. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before

10

February 5, 2020. If you want us to consider whether you were disabled after February 5, 2020, you need to apply again.

Tr. 2.

On December 4, 2020, Plaintiff filed the subject action, contending that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the Appeals Council erred in failing to consider the additional evidence, since the evidence "relate[d] to the issue of whether she was disabled prior to February 5, 2021"; and 2) the ALJ "failed to properly evaluate the New York State Workers' Compensation ratings" and failed to develop the record.[15]

Defendant disputes Plaintiff's arguments and maintains that the Commissioner's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

<u>The Decision of the Appeals Council</u>

Plaintiff alleges that the Appeals Council erred by failing to consider the newly-submitted evidence from Gajewski, Qazi and Matteliano since the evidence relates to the period prior to the ALJ's decision. Defendant disagrees, and essentially parrots the reason offered by the Appeals Council, which is that, "these medical source statements were all completed after the relevant period, and so do not relate to the period at issue." Defendant's Memo of Law, ECF No. 16-1 at p. 29; *see also, id*. at 30 ("[T]he evidence simply fails to shed any meaningful new light on Plaintiff's condition during the relevant period in this case.").

---

[15] ECF No. 14-1 at pp. 18, 22   (Pl.'s Mem. of Law at pp. 17, 21).

"The regulations provide that the Appeals Council 'will' consider 'new' and 'material' evidence that relates to the period on or before the date of the ALJ hearing decision. 20 C.F.R. §§ 404.970(a)(5), 416.1470(b)." *Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019); *see also*, 20 CFR § 404.970(a)(5) ("The Appeals Council will review a case at a party's request or on its own motion if— . . . Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.").[16]

Here, the only reason that the Appeals Council gave for not considering the new evidence from Gajewski, Qazi and Matteliano was that it "d[id] not relate to the period at issue." Tr. 2. The Appeals Council did not explain that finding, except to point out that the evidence was dated after the ALJ's decision. Tr. 2. However, the fact that evidence was created after an ALJ's decision does not mean that it isn't related to the period prior to the ALJ's decision. *See, e.g., Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) ("Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that

---

[16] The Appeals Council will only review such evidence where the claimant shows good cause for not informing the Commissioner of the evidence sooner. See, 20 CFR § 404.970(b) ("The Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if you show good cause for not informing us about or submitting the evidence as described in § 404.935 because: (1) Our action misled you; (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to: (i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person; (ii) There was a death or serious illness in your immediate family; (iii) Important records were destroyed or damaged by fire or other accidental cause; (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing; or (v) You received a hearing level decision on the record and the Appeals Council reviewed your decision.").

12

it had no bearing on the Commissioner's evaluation of Ms. Pollard's claims. To the contrary, the evidence directly supports many of her earlier contentions regarding David's condition."); *see also, Newbury v. Astrue*, 321 F. App'x 16, 18 n. 2 (2d Cir. 2009) ("We note that we have held that medical evidence generated after an ALJ's decision cannot deemed irrelevant solely because of timing. *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir.2004). For example, subsequent evidence of the severity of a claimant's condition may demonstrate that "during the relevant time period, [the claimant's] condition was far more serious than previously thought." *Id*.).

Indeed, courts in this district have previously held that it is error for the Appeals Council to summarily refuse to consider medical evidence that was dated after the ALJ's decision:

> "It is well-established that 'medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing.'" *Siracuse v. Colvin*, No. 14-CV-6681P, 2016 WL 1054758, at *7 (W.D.N.Y. Mar. 17, 2016) (quoting *Newbury v. Astrue*, 321 F. App'x 16, at *2 n.2 (2d Cir. 2009) ). "Additional evidence may relate to the relevant time period even if it concerns events after the ALJ's decision, provided the evidence pertains to the same condition previously complained of by the plaintiff." *Hightower*, 2013 WL 3784155, at *3.
>
> In *Webster v. Colvin*, 215 F. Supp. 3d 237 (W.D.N.Y. 2016), Judge Geraci examined whether the AC's "categorical refusal to consider new and material evidence solely because it was created after the ALJ's decision" was reversible error. *Id*. at 242. In *Webster*, the court stated that the new evidence of plaintiff's back condition could demonstrate that the condition worsened, or it could clarify a pre-hearing disability and suggest that the condition during the relevant time period was worse than previously thought. *Id*. at 243. The court ultimately determined that it could not "assess whether the new evidence relate[d] to the period on or before the ALJ's decision," but that the AC's "cursory, formulaic rejection of the evidence simply because it was generated after the ALJ's decision, without any legal or factual reasoning, is insufficient." *Id*.
>
> Similarly, here, the AC appears to have summarily rejected Dr. Boehlert's opinions simply because the additional evidence "does not relate to the period at issue"

> without analyzing whether the substance of the opinions was related to plaintiff's pre-hearing medical deficits.

*Lofton v. Berryhill*, No. 17-CV-6709-JWF, 2019 WL 1244055, at *2–3 (W.D.N.Y. Mar. 18, 2019) (remanding case to Commissioner for further proceedings).

Moreover, the additional evidence in this case does appear to relate to Plaintiff's condition prior to the date of the ALJ's decision since it involves the very same medical problems that she had for years leading up to the administrative hearing, and there is no suggestion or indication that her condition changed or worsened in the months following the ALJ's decision. *See, e.g., Singleton v. Comm'r of Soc. Sec.*, No. 18-CV-290S, 2019 WL 4783849, at *3 (W.D.N.Y. Oct. 1, 2019) ("Additional evidence may relate to the relevant time period even if it concerns events after the ALJ's decision, provided the evidence pertains to the same condition previously complained of by the plaintiff.") (citations omitted); *see also, Zoeller v. Berryhill*, No. 3:18-CV-19(DFM), 2019 WL 2498388, at *9 (D. Conn. June 17, 2019) ("The plaintiff's new evidence relates to the period on or before the date of the ALJ's decision. Even a cursory review shows the evidence relates to the same back and leg issues that existed before the date of the ALJ's decision. Nothing in the reports suggest they concern new conditions."); *Lofton v. Berryhill*, 2019 WL 1244055 at *3 ("It certainly appears that the conditions and limitations Dr. Boehlert was opining about are the same neck, back, and feet issues that are described in detail in plaintiff's pre-hearing medical record. There is nothing in Dr. Boehlert's RFC evaluation or office notes that would suggest that she was treating plaintiff for new conditions or for symptomology that had suddenly worsened in the five-month period between the ALJ's decision and the date of the RFC assessment. Indeed, the clinical findings and opinions contained in Dr. Boehlert's April

14

2016 functional assessment are remarkably similar to the clinical findings and functional assessment set forth in Dr. Toor's report completed in September 2014 - thus reasonably suggesting that the 'new' evidence pertains to the same conditions previously complained of by the plaintiff.") (citation and internal quotation marks omitted).

Consequently, the Court finds that the Appeals Council erred in failing to consider the additional evidence simply because it was dated after the ALJ's decision.  (The Court makes no finding as to whether the additional evidence otherwise meets the requirements for consideration of such evidence contained in 20 CFR § 404.970(a)(5) & (b)).   Moreover, the error was not clearly harmless since, as described earlier, the excluded evidence contains opinions from Plaintiff's doctors concerning her work-related functional limitations which are not merely duplicative of other evidence and which might have affected the ALJ's decision insofar as they indicate that Plaintiff is not capable of performing light work.[17]   Accordingly, remand is required.

<u>The ALJ's Evaluation of the Medical Opinion Evidence</u>

Plaintiff also contends that the ALJ erred by failing to discuss "the various disability percentages and ratings assigned to the claimant, the statements that the claimant cannot perform full-time work, and the various off-work excuses for the claimant." Tr. 65-66.   The ALJ indicated that he was not required to discuss such evidence because of 20 C.F.R. § 404.1520b(c), which states:

---

[17] Plaintiff contends that the additional evidence indicates that she is limited to performing less than a full-range of sedentary work, which would require a finding that she is disabled. *See*, ECF No. 14-1 at p. 16 ("These opinions – all of which limited [Plaintiff] to a reduced range of sedentary work—undermine the ALJ's finding that she was not disabled as Medical-Vocational Rule ('Grid') 201.14 directs a conclusion of 'disabled' if [Plaintiff] was limited to sedentary work. 20 C.F.R. Pt.404, Subpt. P, App. 2.").

> Evidence that is inherently neither valuable nor persuasive. Paragraphs (c)(1) through (c)(3) apply in claims filed (see § 404.614) on or after March 27, 2017. Because the evidence listed in paragraphs (c)(1) through (c)(3) of this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c:
>
>> (1) Decisions by other governmental agencies and nongovernmental entities. See § 404.1504.
>>
>> (2) Disability examiner findings. Findings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether you are disabled.
>>
>> (3) Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:
>>
>>> (i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;
>>>
>>> (ii) Statements about whether or not you have a severe impairment(s);
>>>
>>> (iii) Statements about whether or not your impairment(s) meets the duration requirement (see § 404.1509);
>>>
>>> (iv) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;
>>>
>>> (v) Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels in Part 404, Subpart P, Appendix 2, Rule 200.00 instead of descriptions about your functional abilities and limitations (see § 404.1545);
>>>
>>> (vi) Statements about whether or not your residual functional capacity prevents you from doing past relevant work (see § 404.1560);
>>>
>>> (vii) Statements that you do or do not meet the requirements of a medical-vocational rule in Part 404, Subpart P, Appendix 2; and
>>>
>>> (viii) Statements about whether or not your disability continues or ends when we conduct a continuing disability review (see § 404.1594).

20 C.F.R. § 404.1520b (Westlaw 2022).

The evidence which the ALJ declined to discuss appears to fit within the contours of this regulation, meaning that the ALJ was *not* required to discuss it. Plaintiff nevertheless contends, however, that the ALJ should have developed the record to find out why those doctors had indicated that Plaintiff had various percentages of disability. *See*, ECF No. 14-1 at p. 23 ("Here, ALJ Cordovani took no steps to further develop the record by recontacting Drs. Fahrbach, Wong, Siddiqui, Qazi and PA Gajewski to request a function-by-function assessment."); *see also, id*. ("[T]he record was incomplete[.]").[18]

The legal principles concerning an ALJ's duty to develop the record, are generally well settled:

> "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). "Whether dealing with a *pro se* claimant or one represented by counsel, the ALJ must 'develop [the claimant's] complete medical history.'" *Lopez v. Comm'r of Soc. Sec.*, 622 Fed.Appx. 59, 60 (2d Cir. 2015) (summary order) (citing 20 C.F.R. § 404.1512; *Perez*, 77 F.3d at 47 (describing duty to develop record)). "[T]he agency is required [to] affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 Fed.Appx. 7, 9 (2d Cir. 2014) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999)). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation

---

[18] The Court observes, in this regard, that in this action Plaintiff is represented by the same law firm which represented her at the administrative hearing, and which made no objection to the completeness of the record on this point. Tr. 97. In now asserting that the ALJ failed to develop the record, Plaintiff states that it "is not realistic to expect physicians on their own initiative to outline a detailed function-by-function assessment that the Social Security Administration deems essential to this disability adjudication process." ECF No. 14-1 at p. 23. That may be true, but it is realistic to expect that a claimant's attorney would obtain such an assessment if at all possible. Here, as discussed below, Plaintiff's attorney did obtain a detailed function-by-function assessment (Exhibit 53F) from a different source, but evidently chose not to obtain ones from Drs. Fahrbach, Wong, Siddiqui, Qazi and PA Gajewski in connection with the hearing. The attorney did, however, obtain such reports from Matteliano, Qazi and Gajewski *after* the ALJ's decision.

17

> to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue*, 474 Fed.Appx. 801, 804 (2d Cir. 2012) (unpublished opn.) (quotations and citations omitted).

*Gonzalez v. Colvin*, No. 1:15-CV-00767(MAT), 2018 WL 1040250, at *2 (W.D.N.Y. Feb. 24, 2018).

> Where there are medical records from treating physicians, and "the treatment notes and test results from the claimant's treating physicians do not assess how the claimant's symptoms limit [his] functional capacities,' " the record is incomplete, warranting remand. *Hernandez v. Saul*, No. 3:19-CV-01033(WIG), 2020 WL 3286954, at *4 (D. Conn. June 18, 2020); *see also Brazil v. Berryhill*, 19-CV-7041(RWL), 2020 WL 5440472, at *7 (S.D.N.Y. Sept. 10, 2020). On the other hand, a lack of a formal source statement from a treating physician does not always require remand if the ALJ can glean an informal assessment of the plaintiff's limitations from the treating physician's notes. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order); *Sanchez v. Colvin*, No. 13-CV-6303(PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015); Prince v. Colvin, No. 13-CV-7666(TPG), 2015 WL 1408411, at *17 (S.D.N.Y. Mar. 27, 2015) (Because the record before the ALJ "contained detailed medical records" from Plaintiff's treatment with the treating physician, the ALJ "was not required to obtain a medical source statement" from the treating physician.).

*Spain v. Comm'r of Soc. Sec.*, No. 20CIV4837NSRJCM, 2021 WL 6808295, at *12 (S.D.N.Y. Dec. 28, 2021), report and recommendation adopted, No. 20CIV4837NSRJCM, 2022 WL 123619 (S.D.N.Y. Jan. 13, 2022).

Here, the Court does not agree with Plaintiff that the ALJ had a duty to develop the record to determine why the various doctors had indicated, in their worker's compensation reports, that Plaintiff had a particular percentage of disability, or to ask them to translate those percentages into a detailed function-by-function assessment, since the record did not have obvious gaps concerning Plaintiff's functional abilities. Rather, the record included an extensive, nine-page

RFC evaluation from Joseph J. Higgins, OT/L, ("Higgins"), obtained by Plaintiff, which the ALJ considered. Tr. 65 (referring to Exhibit 53F), 98-99. The record also contained additional, though less-extensive, functional assessments from Drs. Koenig, Fahrbach, Carr, Hailoo and Kanoff, which the ALJ discussed. Tr. 64-65. Consequently, the Court finds that Plaintiff's contention on this point lacks merit.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 14) is granted, Defendant's cross-motion (ECF No. 16) is denied, and this matter is remanded to the Commissioner for further proceedings consistent with this Decision and Order pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment and close this case.

So Ordered.

Dated: Rochester, New York
March 16, 2022

ENTER:

_Charles J. Siragusa_
CHARLES J. SIRAGUSA
United States District Judge